UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

THOMAS BLUME and JASON MARTINEZ

    Plaintiffs,

-against-

PORT AUTHORITY TRANS-HUDSON
CORPORATION

    Defendant.

No. 18-cv-12251 (CM)

**ORDER DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

McMahon, C.J.:

Plaintiffs Thomas Blume and Jason Martinez brought this case under the Federal Employers' Liability Act, 45 U.S.C. § 51 *et seq.*, seeking to recover for injuries they sustained while working for the Defendant, Port Authority Trans-Hudson Corporation ("PATH"), a commuter rail service operating in the New York City metropolitan area. Plaintiffs allege that, from the beginning of January 2016 through May 2016, they suffered damage to their pulmonary and respiratory systems due to PATH various acts of negligence in connection with its use of Tank Brite Plus ("TBP"), an industrial chemical used to clean train cars. (Dkt. No. 1, Complaint.) Specifically, PATH breach the duty of care owed to its employees by failing to train them on the proper and safe use of TBP, failing to provide them with proper personal protective equipment, failing to issue adequate warnings regarding the toxic effects of exposure of TBP, and failing to enact adequate safety rules to the curb the risk of such exposure. (*Id.*)

Discovery concluded on September 4, 2019. (Dkt. No. 17.) Expert depositions followed, including the deposition of Plaintiffs' expert on pharmacology and toxicology, Donald A. Fox, Ph.D., who submitted a report concluding that Plaintiffs' exposure to TBP was the cause of their injuries.

Now before this Court is PATH's motion for summary judgment on the grounds that Dr. Fox's report is not the sort of methodologically sound expert medical testimony necessary to prove causation in a toxic tort case, and, without Dr. Fox's inadmissible report, Plaintiffs have submitted no evidence that creates genuine dispute as to the element of causation. (Dkt. No. 18, 19.)

PATH's motion presumes that Plaintiffs must present expert testimony linking the toxin in question to the resulting symptoms in order to present their case to a jury, and, therefore, Plaintiffs' failure to procure such testimony in discovery justifies summary judgment. However, that argument ignores the legal standard governing causation applicable to negligence cases brought under FELA, which is less stringent than the standard under common law. To survive summary judgment in a FELA action, Plaintiffs need only create a genuine dispute as to whether "employer negligence played any part, even the slightest, in producing the injury or death for which damages are sought." *Tufariello v. Long Island R. Co.*, 458 F.3d 80, 87 (2d Cir. 2006) (quoting *Rogers v. Mo. Pac. R.R. Co.*, 352 U.S. 500, 506, 77 S.Ct. 443, 1 L.Ed.2d 493 (1957)). Accordingly, some FELA cases may proceed to trial even without admissible expert testimony supporting the causation element of a negligence claim.

This is one such case. For that reason, and those that follow, PATH's motion for summary judgment is denied.

## BACKGROUND

The following facts, drawn from the parties' respective Rule 56.1 statements and counter-statements of undisputed facts (Dkt. Nos. 21, 29, 30, & 36), are summarized in the light most favorable to the non-moving party. *See, e.g., Kendall v. Metro-North Commuter R.R.*, No. 12-cv-6015, 2014 WL 1885528, at *2 (citing *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 456 (1992).

### A. Tank Brite Plus

Tank Brite Plus is a hazardous chemical that combines sulfuric acid, phosphorous acid, ammonium biflouride, and glycol ether EB. (Dkt. No. 30, Pl.'s Local Rule 56.1 Statement ("Pl.'s 56.1") ¶ 122.)

Federal regulations promulgated by the Occupational Safety and Health Administration ("OSHA"), *see* 29 CFR § 1910.1200, require the manufacturer of TBP, JMN Specialties, Inc., to prepare a safety data sheet ("SDS") identifying the hazards, necessary protective measures, and toxicological effects of exposure to TBP. 29 CFR § 1910.1200(g). The regulations also instruct any employer using TBP "[to] maintain in the workplace copies of the required safety data sheets . . . and ensure that they are readily accessible . . . to employees." *Id.*

Section 2 of the TBP SDS identifies the following hazards associated with the product: skin corrosion, skin irritation, eye damage, and aspiration injuries in the event that the chemical "enters the airways" of a human being. (Dkt. No. 19, Declaration of T. Brophy ("Brophy Decl."), Ex. B (hereinafter, "Fox Report"), at 6-7.)

Accordingly, Section 8 of the SDS instructs employers using TBP to only use the chemical in a space with "Good general ventilation," and to ensure that their employees are

equipped with "air-purifying respirator[s]," "chemical goggles," and "chemical resistant, impermeable gloves." (*Id.* at 8.)

The SDS also notifies employers and employees with examples of the possible consequences of not adhering to safety guidelines. Section 11 warns that TBP "may be harmful or fatal" if inhaled; "may cause mild to severe skin irritation or possible skin burns;" "may cause . . . irreversible eye damage," and may cause "Respiratory or Skin Sensitization." (*Id.* at 7.)

### B. Plaintiffs' Injuries

#### 1. Blume

Thomas Blume worked at the Harrison Car Maintenance Shops, a PATH facility located in Harrison, New Jersey, where PATH used TBP to clean train cars beginning in January 2016. (Pl.'s 56.1 ¶ 72.) Although Blume did not use TBP to perform his job duties, he could smell the chemical rom his workstation in a pit underneath the trains when it was used by the employees cleaning the cars f. (*Id.* ¶ 73.) TBP would drip down onto Blume's shoulders, through his shirt, and onto his skin while he was in the pit. (*Id.* ¶¶ 75-76, 78.)

Bothered by the smell of TBP, Blume began wearing a personal respirator that he provided himself; PATH did not provide Blume with a respirator. (*Id.* ¶¶ 79-81.) Even with the respirator, Blume was still able to smell TBP in his work area throughout his shift, and began to suffer from a sore throat, coughing, bloody noses and tightness in his chest. (*Id.* ¶¶ 81, 82, 84.) When Blume reported these injuries to his supervisor, he informed PATH that he was experiencing "inadequate air circulation" in his work area that was contributing to "repeated exposure to Tank Brite chemical." (*Id.* ¶ 83; *see also* Dkt. No. 31-7, Decl. of P. Finn ("Finn Decl."), Ex. G.)

Eventually, Blume sought medical attention, and was treated by a pulmonologist, Dr. Lopa Patel, for chest pains and difficulty breathing. (Finn Decl. Ex. H.) In her opinion, Blume suffered from decreased lung capacity as of June 27, 2016. (*Id.* at 4.) She recommended that he avoid contact with TBP, and be cautious when using other chemicals at work. (*Id.* at 7.) Blume also consulted with an otolaryngologist, Dr. Gerald West, for the injuries to his nose, sinuses and throat. (Finn Decl. Ex. I.) Dr. West cauterized Blume's nostrils to repair his septum after damage sustained during "a history of exposure to Tank Brite Plus." (*Id.* at 10, 14.)

### 1. Martinez

Jason Martinez was one of the maintenance workers who used TBP to clean train cars at the Harrison PATH facility. (Pl.'s 56.1 ¶ 90.) He was exposed to TBP three days a week for several months beginning in January 2016, sometimes diluting the chemical with water, and sometimes using TBP undiluted, as instructed to by his supervisor, Vincent Lombardi. (*Id.* ¶¶ 92-94, 99.) Martinez used TBP in a workspace where the fans were broken and where, for at least some portion of the relevant time period, the doors were kept closed obstructing ventilation. (*Id.* ¶¶ 112-113.)

When Martinez used TBP, it came in contact with his skin and eyes, leaving red marks that resembled cigarette burns (*id.* ¶¶ 95-98); even so, PATH did not provide Martinez with a respirator until May 25, 2016, after he vomited on himself while using the chemical, (*id.* 107.) However, even using the respirator, Martinez was able to smell TBP. (*Id.* ¶ 104-106.) When he raised his concerns about TBP with Lombardi, Martinez was told there was nothing management could do, and that "this is what the job is." (Finn Decl. Ex. B, at 101:3.)

Similar to Blume, Martinez suffered from headaches, runny noses, coughing, bloody noses, sore throat, and chest tightness. (Pl.'s 56.1 ¶ 102.) Those symptoms would abate during

the time he spent away from cleaning duty, but returned once he was back at the Harrison facility. (*Id.* ¶ 103.) In addition, Martinez reported having suffered over 40 asthma attacks since his first exposure to TBP. (*Id.* ¶ 115.) Martinez also received treatment from Dr. Patel, who confirmed that Martinez suffers from occupational asthma, and diagnosed him with reduced ventilatory capacity, chronic reactive airways dysfunction syndrome ("RADS"), multiple nodules in his lungs, chest tightness, and difficulty breathing. (Finn Decl. Ex. I, at 8-9, 29, 31, 33.) She recommended that Martniez "avoid exposure to Tank Brite." (*Id.* at 33.)

### C. Dr. Fox's Report and Methodology

Plaintiffs rely in part on the report and testimony of Dr. Fox, a toxicologist and neurobiologist with 40 years experience, to support their claim that exposure to TBP caused their respiratory and pulmonary injuries. (*See* Pl.'s 56.1 ¶ 120; Fox Report.) In Dr. Fox's view, "Martinez's and Blume's exposure to TBP at PATH from January 2016 through May 2016 produced their acute respiratory distress and injury," as well as long-term effects like "persistent respiratory and pulmonary symptoms," including occupational asthma in Martinez, and "functional respiratory deficits and excoriated nasal passages" in Blume. (Fox Report at 13.) Fox also offers his opinion that the SDS put PATH on notice that Marinez's and Blume's symptoms were consistent with the "adverse exposure events" detailed in the TBP SDS, that continuous exposure to TBP "would result in long-term adverse chronic pulmonary and respiratory symptoms," and that "lack of adequate and proper protection . . . would cause these adverse acute and chronic toxicological effects." (*Id.* at 12-13.)

In forming these opinions, Dr. Fox analyzed the factors common to "every toxicology issue," namely: "(i) route of exposure; (ii) time-dependent duration of exposure; (iii) concentration of exposure and (iv) mechanism[s] of action of the chemical[s]." (*Id.* at 8-9.) Each of these factors is relevant to determining whether a given instance of exposure has

exceeded the "no observable effect level" ("NOEL"), the dose of a particular toxin "that you have to reach in order to produce a biologically significant event." (Brophy Decl. Ex. C at 68:7-12.) As Dr. Fox testified, "dose makes the poison." (*Id.* at 67:6-7.)

Dr. Fox's report is most detailed with regard to the final factor, "mechanisms of action," *i.e.*, how TBP could harm an exposed individual, despite the fact that he did not perform independent laboratory research on TBP itself. Nor did he locate any research studies analyzing the particular short-term and long-term pathophysiological effects on humans of TBP. (*See, e.g.*, Finn Decl. Ex. A at 39:21-24.) Instead, Dr. Fox reviewed data and studies related to each of TBP's component parts: sulfuric acid (5-15% of TBP), phosphorous acid (20-30%), ammonium biflouride (5-10%), and glycol ether EB (1-5%). (Fox Report at 9.) Those sources included toxicology textbooks dealing with environmental chemicals, reports from the New Jersey Department of Health, and TOXNET, a compendium of toxicology literature. (Finn Decl. Ex. A at 64:8-65:12.) Dr. Fox's research confirmed that each of the four ingredients in TBP "causes concentration-dependent respiratory and pulmonary irritation when inhaled." (Fox Report at 9.) His conclusion on "mechanisms of action" therefore depends upon "assumptions" that TBP causes similar "adverse effects of these chemicals individually." (Brophy Decl. Ex. C at 59:12-23.)

For the other three factors relating to the nature, length, and severity of exposure -- all relevant to determining the dose of TBP ingested by Blume and Martinez -- Dr. Fox relied solely upon the Plaintiffs' testimony. In doing so, he acknowledged gaps in the available evidence. For example, Dr. Fox was unable to say "what the concentration of Tank Brite was" or "how much they were exposed to" on the days in question. (*Id.* 59:12-23; 61:1-2.) Nor could he say precisely what the proportions of the four components were in the batch of TBP used by

PATH. (*Id.* at 79:23-25.) Dr. Fox also provided his own estimate as to the amount of time during which Blume and Martinez were exposed to TBP, which he admitted was not supported by "mathematical calculation." (*Id.* at 59:13.)

Nonetheless, Dr. Fox testified that TBP had a "coherent relationship" with its component chemicals, by comparing toxicological attributes of each component such as the "effects," "dose response," and "strength of associations of effects that the individuals chemicals have with Tank Brite Plus." (Finn. Decl. Ex. A at 23:8-23.) In doing so, Dr. Fox employed the Bradford Hill criteria, also referred to simply as the Hill Criteria, an epidemiological method used to model cause and effect relationships between toxins and pathophysiological symptoms. (*See, e.g., id.* At 24:4-8.) While the Hill Criteria are neither referenced nor explained in his report, Dr. Fox testified that the criteria applicable to each component could be extrapolated to TBP as a whole, because the components "have a synergistic relationship." (Pl.'s 56.1 ¶ 124.)

### D. Defendant's Response

PATH does not challenge Dr. Fox's credentials as a toxicologist. Rather, PATH argues that Dr. Fox employed an unreliable and unsound methodology to opine on the cause of Plaintiffs' symptoms. In particular, PATH claims that Dr. Fox's has no basis to infer the toxicological effects of TBP from the effect of its component parts, nor does he possess the information necessary to determine the dose of TBP to which Blume and Martinez were exposed. Furthermore, PATH argues that, as a toxicologist, Dr. Fox is not qualified to employ the Hill Criteria, which are strictly the province of epidemiologists and other medical doctors. While PATH concedes that there is a temporal connection between the use of TBP at the Harrison facility and the Plaintiffs' injuries, PATH argues that a toxicology opinion based on

temporal proximity alone is insufficient to establish causation with respect to medical conditions in a toxic tort case.

## DISCUSSION

### I. Legal Standard

Summary judgment is appropriate where "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c)(2). "The burden of showing that no genuine factual dispute exists rests on the party seeking summary judgment, and in assessing the record to determine whether there is a genuine issue as to a material fact, the court is required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." *Atl. Mut. Ins. Co. v. CSX Lines, L.L.C.*, 432 F.3d 428, 433 (2d Cir.2005) (quoting *Sec. Ins. Co. of Hartford v. Old Dominion Freight Line Inc.*, 391 F.3d 77, 83 (2d Cir.2004)); *Chambers v. TRM Copy Ctrs. Corp.*, 43 F.3d 29, 36 (2d Cir.1994) (Kearse, J.). "If there is any evidence in the record from which a reasonable inference could be drawn in favor of the non-moving party on a material issue of fact, summary judgment is improper." *Westinghouse Credit Corp. v. D'Urso*, 278 F.3d 138, 145 (2d Cir.2002); *accord Brown v. Cara*, 420 F.3d 148, 152 (2d Cir.2005) ("We will affirm the District Court's grant of summary judgment to defendants only if, based on facts not in genuine dispute and drawing all inferences in favor of plaintiffs, defendants are entitled to judgment on the merits as a matter of law."). "A dispute as to a material fact is 'genuine,' and hence summary judgment is not appropriate, under this standard, only 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Lang v. Ret. Living Publ'g Co.*, 949 F.2d 576, 580 (2d Cir.1991) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S.

242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)); *accord N.Y. Stock Exch., Inc. v. N.Y., N.Y. Hotel LLC,* 293 F.3d 550, 554 (2d Cir.2002).

## II. PATH'S MOTION FOR SUMMARY JUDGMENT IS DENIED.

### a. The Federal Employer's Liability Act

FELA provides that any railroad engaging in interstate commerce "shall be liable in damages to any person suffering injury while he is employed by such carrier in such commerce ... for such injury or death resulting in whole or in part from the negligence of any of the officers, agents, or employees of such carrier." 45 U.S.C. § 5. To prevail on a claim of negligence against a railroad employer, the plaintiff must prove "the traditional common law elements of negligence: duty, breach, foreseeability, and causation." *Tuffariello,* 458 F.3d at 87. Although the elements are identical, the plaintiff's burden for proving those elements "is lighter under FELA than it would be at common law because 'the theory of FELA is that where the employer's conduct falls short of the high standard required of him by the Act and his fault, in whole or in part, causes injury, liability ensues.'" *Id.* (quoting *Kernan v. Am. Dredging Co.,* 355 U.S. 426, 438–39, 78 S.Ct. 394, 2 L.Ed.2d 382 (1958)).

With respect to duty and breach, a FELA-covered employer has "a duty to provide its employees with a safe workplace," which it has breached "if it knew or should have known of a potential hazard in the workplace, and yet failed to exercise reasonable care to inform and protect its employees." *Ulfik v. Metro–North Commuter R.R.,* 77 F.3d 54, 58 (2d Cir.1996). Accordingly, the Second Circuit has observed that "an employer may be held liable under FELA for risks that would otherwise be too remote to support liability at common law." *Id.*

FELA also relaxes the standard of proof required to show causation. In a common law negligence action, a plaintiff generally must show that the defendant's conduct was a "substantial

factor in bringing about the harm." Restatement 2d of Torts § 431(a). Under the federal common law of FELA actions, *see Morant v. Long Island R.R. Co.*, 66 F.3d 518, 522 (2d Cir.1995), though, the plaintiff carries a lighter burden. As the Supreme Court has held, "FELA's langauge on causation . . . is as broad as could be framed." *CSX Transp., Inc. v. McBride*, 564 U.S. 685, 691 (2011) (internal quotation marks and citations omitted).

Thus, "the test of a jury case" in a FELA action "is simply whether the proofs justify with reason the conclusion that employer negligence played any part, even the slightest, in producing the injury or death for which damages are sought." *Rogers v. Mo. Pac. R.R. Co.*, 352 U.S. 500, 506, 77 S.Ct. 443, 1 L.Ed.2d 493 (1957). This test "displaces common law standards of proximate causation" and permits juries to enter a verdict for the plaintiff "no matter how small" the railroad's negligence. *Kendall v. Metro-North Commuter R.R.*, 12-cv-6015, 2014 WL 1885528, at *4 (quoting *CSX*, 564 U.S. at 705).

### b. Expert Testimony is Not Required to Prove Causation.

PATH forwards a number of arguments often deployed in common law toxic tort cases to exclude expert testimony on causation and obtain summary judgment for a plaintiff's failure to put forth admissible evidence creating a genuine dispute of material fact as to that element. In those cases, courts in this jurisdiction ruled expert testimony admissible when it follows the methodology used by the World Health Organization and the National Acaedmy of Sciences.

As my former colleague, the Hon. William C. Conner explained in *Mancuso v. Consol. Edison Co. of N.Y., Inc.*, 967 F. Supp. 1437 (S.D.N.Y. 1997), this method:

> "Requires first that the expert determine the dosage of the toxin at issue to which the plaintiff was exposed. Second, the expert must establish 'general causation' by demonstrating that, according to scientific literature, levels of the toxin comparable to those received by the plaintiff can cause the specific types of injuries he alleges. The correlation between dosage and the response it engenders in a living organism is called the 'dose-response' relationship. Third, the expert must establish specific causation, by

demonstrating that, more likely than not, the toxin caused the plaintiff's injuries in this particular case. Critical to establishing specific causation is exclusion of other possible causes of the symptoms."

*Id.* at 1445-46 (internal citations omitted).

According to PATH, Dr. Fox's report and testimony do not conform to the accepted toxicological method, and are therefore inadmissible for a variety of reasons. For example, Dr. Fox admitted he had no hard data to support his conclusions regarding dose of exposure; expert opinions regarding dosage based on the testimony of a party lacking any "technical or professional expertise in detecting and quantifying toxic emissions," such as Blume and Martinez, "[are] insufficient to establish dosage amount." *Wills v. Amerada Hess Corp.*, 379 F.3d 32, 49 (2d Cir. 2004). In addition, Dr. Fox failed to locate or analyze any scientific literature on the toxicological effects of TBP, instead studying the attributes of its component ingredients; expert opinions "based on data, a methodology, or studies that are simply inadequate to support the conclusions reached" must be excluded under Federal Rule of Evidence 702. *Ruggiero v. Warner-Lambert Co.*, 424 F.3d 249, 255 (2d Cir. 2005). Finally, absent proof that TBP could have caused the injuries at issue in this case, an expert "may not link any particular patient's injury" to the chemical; that is, an expert may not "rule in" one particular cause for an injury based on its temporal occurrence with respect to the plaintiffs without more generalized evidence that the toxin is capable of causing the harm. *In re Rezulin Products Liability Litig.*, 369 F. Supp. 2d 398, 436 (S.D.N.Y. 2005).

It is true that courts have imposed rigorous standards for expert testimony in common law toxic torts cases. However, this is a FELA case governed by a relaxed causation standard, and in many such cases, even those involving toxic chemicals, circumstantial evidence, expert testimony, or common knowledge "may provide a basis from which the causal sequence may be inferred." *Ulfik v. Metro-North Commuter R.R.*, 77 F.3d 54, 60 (2d Cir. 1996). Expert testimony

is not necessary when "there is a generally understood causal connection between physical phenomena . . . and the alleged injury that would be obvious to laymen." *Tufariello*, 458 F.3d at 88.

The Second Circuit's decision in *Ulfik* illustrates the distinction between the types of injuries that would be "obvious" versus those that require expert testimony on general and specific causation. In *Ulfik*, the plaintiff was an employee of the Metro North Railroad who fell down a flight of stairs due to dizziness from inhaling paint and solvent fumes a few days earlier while working in the company's railroad tunnels. *Ulvik*, 77 F.3d at 55. The lower court granted Metro North judgment as a matter of law, ruling that there was insufficient expert testimony to establish causation between the fumes and Ulvik's fall. *Id.* at 57. The Second Circuit reversed, reasoning that "the trier of fact could reasonably determine, without expert testimony, that prolonged exposure to paint fumes would cause headache, nausea, and dizziness." *Id.* at 60.

Likewise, in *Romanelli v. Long Island Railroad Company*, 898 F. Supp. 2d 626 (S.D.N.Y. 2012), the court determined that a jury could understand "that the inhalation of large quantities of stone dust and fumes from burning kerosene and fresh asphalt can cause respiratory problems," without the aid of "expert testimony on causality," while noting that the "nexus between pulmonary conditions and cardiac arrhythmias is not so straightforward." *Id.* at 632. My former colleague, Judge Scheindlin, ruled that expert testimony was not required for the jury to draw a causal connection between environmental contaminants and asthma or RADS, two conditions which Martinez's doctors ascribe to his exposure to TBP. *Id.* It was only on the second-order question -- whether those respiratory conditions aggravated the plaintiff's pre-existing heart problems -- that she required expert testimony to prove causation. *Id.*

Together, *Ulfik* and *Romanelli* permit a jury sitting in this district to assess whether the Plaintiffs' respiratory and pulmonary conditions were caused by their exposure to TBP, even in the absence of admissible expert testimony. Here, as in *Ulfik*, a jury could find a causal connection between TBP -- a hazardous chemical that poses particular dangers if it "enters the airways" of a human being -- and the alleged injuries to the Plaintiffs' throats, nostrils, and lungs. The Plaintiffs' own accounts and medical records document readily observable symptoms, like headaches and difficulty breathing, rather than the sort of complex medical conditions like cancer that may demand expert epidemiological and medical testimony to establish causation. *See, e.g., Byfield v. Chapman*, 141 F. Supp. 221, 225 (W.D.N.Y. 2015); *Wills*, 379 F.3d at 38 (expert testimony necessary to prove exposure caused squamous cell carcinoma).

Therefore, whether or not this Court permits Dr. Fox to testify regarding the specific toxicological effects of TBP, Plaintiffs may present evidence of causation to the jury. *See, e.g., Alioto v. Long Island R.R. Co.*, No. 16-cv-1092, 2018 WL 4054103, at *6-7 (E.D.N.Y. Aug. 24, 2018).

### C. There is a Genuine Dispute as to Causation.

Even without considering Dr. Fox's opinion, there is evidence, undisputed by PATH, that Blume and Martinez worked in close proximity to both diluted and undiluted quantities of TBP at the Harrison facility, without the aid of protective gear recommended by the manufacturer. (Pl.'s 56.1 ¶¶ 72, 80, 90, 91, 96.) The Plaintiffs also testified that PATH did not adequately ventilate the Harrison facility, thus trapping toxic fumes from TBP in the work area. (*See, e.g., id.* ¶¶ 83, 113.) Finally, there is evidence that Blume and Martinez suffered respiratory and pulmonary ailments in the days, weeks, and months following their exposure to

TBP (*id.* ¶¶ 85-86, 116-117), and that those symptoms were identified as potential effects of exposure to TBP in the SDS, (Fox Report at 6-8).

Furthermore, the premise of PATH's arguments – that there is no admissible expert testimony – is very much open to question. In fact, I am prepared to say today that certain aspects of Dr. Fox's testimony are admissible under Federal Rule of Evidence 702 and the Supreme Court's decision in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). His qualifications are unquestioned and he is certainly qualified to explain how a chemical like TBP could have toxic effects – which, assuming expert testimony were required, would be sufficient to get Plaintiffs past this motion. PATH may later attack the bases of those opinions as unfounded, but must do so on cross-examination of Dr. Fox, since such challenges "go to the weight, not the admissibility, of the testimony." *See Hewitt v. Metro-North Commuter R.R.*, 244 F. Supp. 3d 379, 385 (S.D.N.Y. 2017). Whether some of Dr. Fox's other opinions are admissible under *Daubert* is not an issue that needs to be decided today, but at least to the extent that Dr. Fox is able to shed light on the hazards posed by TBP, his testimony is admissible.

Therefore, on the basis of the record presented on this motion, there is a genuine dispute whether PATH's failure to take proper precautions while using TBP at its Harrison facilities played a part in causing the Plaintiffs' inhalation injuries. PATH's motion for summary judgment is denied.

## CONCLUSION

Defendant's motion for summary judgment is DENIED.

The clerk of the court is hereby ordered to close the motion at Docket Number 18. This shall constitute the written opinion of the court.

Dated: April 6, 2020
New York, New York

_____
Chief Judge

BY ECF TO ALL PARTIES